## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Criminal No. 6:23-cr- 11** |
| **v.** ) | |
| ) | **INFORMATION** |
| **JOHN GREGORY BARNES,** ) | |
| **a/k/a GREG BARNES,** ) | **In Violation of:** |
| **Defendant.** ) | **18 U.S.C. § 371** |

The United States Attorney Charges:

## INTRODUCTION

At all times relevant to this Information:

1.      John Gregory Barnes ("BARNES") was a resident of Mount Pleasant, South Carolina.

2.      In late 2014, BARNES bought a medical practice that he operated using the names "L5 Medical Holdings, LLC," ("L5") and "Pain Care Centers." L5 operated medical practices ("clinics") located in the Western District of Virginia, including in Woodlawn, Lynchburg, Madison Heights, Blacksburg, and Christiansburg.

3.      Physician 1 and Physician 2 were physicians employed by L5 to provide medical care to Pain Care Centers patients and to supervise other medical providers who worked for L5.

4.      L5's clinics focused largely on pain management (which involved prescribing Schedule II opioids) and opioid addiction treatment (which involved prescribing Suboxone and buprenorphine products).

5.      Suboxone and other buprenorphine products are approved for use to treat opioid addiction by preventing symptoms of withdrawal from heroin, oxycodone, and other opiates, and

opioids. Only health care providers with a specialized DEA number (called an "X-Number") were permitted to prescribed buprenorphine for opioid addiction treatment.

**Federal Health Care Benefit Programs**

6.      Medicare and Virginia Medicaid were and are health care benefit programs funded and administered by the United States Government. Medicare and Virginia Medicaid provided and provide health care benefits to eligible recipients, including payment for laboratory services, such as urine drug screens, and prescription drugs.

7.      Medicare was established to provide medical services to elderly, blind, and disabled beneficiaries pursuant to the provisions of the Social Security Act. Medicare would and will only pay for treatments and services and items (such as laboratory tests and prescription medications) that were and are considered medically necessary, performed within accepted medical standards, and rendered for a legitimate medical purpose.

8.      Virginia Medicaid was and is a health care benefit program that was established pursuant to Title 19 of the Social Security Act of 1965 and was designed to provide medical assistance services to indigent persons. Medicaid would and will only pay for services and items (such as laboratory tests and prescription medications) that were and are considered medically necessary, performed within accepted medical standards, and rendered for a legitimate medical purpose.

**Illegitimate Prescriptions**

9.      Patients who had insurance, including Medicare, Medicaid, and other health care benefit programs, used their insurance benefits to pay for prescriptions issued by providers at L5's clinics.

10.     In many cases, the prescriptions that L5 providers and staff caused to be issued were not issued for a legitimate medical purpose in the usual course of professional practice and thus were not medically necessary.

11.     Frequently, L5 providers and staff caused prescriptions to be issued in the name of a provider who did not provide medical care to the patient.

12.     Medicare and Virginia Medicaid were and are not authorized to pay for medically unnecessary prescriptions.

### Urine Drug Screens

13.     Providers at L5's clinics frequently ordered both qualitative and quantitative urine drug screens for their patients. The proper purpose of urine drug screens was and is to assess patients for drug use and provide information pertinent to medical treatment.

14.     Qualitative drug screens were and are designed to detect the presence or absence of a drug in a patient's urine.

15.     Quantitative drug screens were and are designed to detect the presence and the quantity of a drug in the patient's urine, the drug's metabolites in the patient's urine, or both. These drug screens were and are the most reliable, and the most expensive, kind of urine drug screen.

16.     L5 providers and staff, at the direction of BARNES and others, ordered, performed, and billed for medically unnecessary urine drug screens.

17.     Medicare and Virginia Medicaid are not authorized to pay for medically unnecessary urine drug screens.

18.     Medicare and Virginia Medicaid paid L5 for urine drug screens, including medically unnecessary urine drug screens, ordered, performed, and billed for by L5 providers and staff.

3

COUNT ONE
(Conspiracy to Commit Offenses Against the United States)

19.     Paragraphs 1 through 18 of the Introduction to this Information are realleged and incorporated as if fully set forth herein.

20.     From on or about 2014, and continuing thereafter until on or about 2022, in the Western District of Virginia and elsewhere, JOHN GREGORY BARNES did knowingly and intentionally combine, conspire, confederate, and agree with L5 Medical Holdings, LLC; L5's COO; Physician 1; Physician 2; and others known and unknown to commit the following offenses against the United States:

     a.  To knowingly and intentionally use, in the course of dispensing and distributing controlled substances, registration numbers issued to others, in violation of Title 21 United States Code, Section 843(a)(2);

     b.  To knowingly dispense and distribute buprenorphine, a Schedule III controlled substance, not for a legitimate medical purpose in the usual course of professional practice, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E); and

     c.  To knowingly and willfully execute and attempt to execute a scheme and artifice to (a) defraud health care benefit programs and (b) obtain by means of false and fraudulent pretenses, representations, and promises, money under the custody and control of Medicare and Virginia Medicaid, which are health care benefit programs as defined by Title 18, United States Code, section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

4

## The Manner and Means of the Conspiracy

21.     It was a part of the conspiracy that BARNES, L5, and their coconspirators would and did cause Medicare and Virginia Medicaid to make payments to L5 by fraudulently ordering, completing, and billing for urine drug screens that were medically unnecessary and the results of which were not used in directing the care of the patient.

22.     It was further a part of the conspiracy that BARNES and L5 designed a urine drug testing protocol that was inappropriately regular and non-random and was structured around insurance reimbursement rather than medical necessity and patient care.

23.     It was further a part of the conspiracy that L5's management instructed L5 providers and staff to order medically unnecessary urine drug screens.

24.     It was further a part of the conspiracy that BARNES and L5 set up an in-house laboratory to allow L5 to conduct urine drug screen testing "in-house" versus sending the samples to a third-party laboratory to provide an extra revenue stream for L5.

25.     It was further a part of the conspiracy that L5's management instructed weeks-old and months-old urine samples that were no longer useful for purposes of patient care to be tested in order to bill insurance for these urine drug screens.

26.     It was further a part of the conspiracy that BARNES, L5, and their coconspirators would and did cause Medicare and Virginia Medicaid to make payments for prescriptions for Suboxone and buprenorphine, Schedule III controlled substances, that were not for a legitimate medical purpose and were beyond the bounds of medical practice, knowing that Medicare and Virginia Medicaid would be billed for those medically illegitimate prescriptions.

27.     It was further a part of the conspiracy that BARNES and L5 paid Physicians 1 and 2 to allow Suboxone and buprenorphine prescriptions to be written by other medical providers

5

using the X-Numbers registered in the names of Physicians 1 and 2, even when the physician whose X-Number was being used had not provided medical care to the patient in whose name the prescription was written.

28.     It was further part of the conspiracy that L5's management encouraged medical providers to follow the advice of medically unqualified individuals in the course of treatment and prescribing decisions, and that Physician 1, Physician 2, and others in fact did so.

29.     It was further a part of the conspiracy that BARNES and L5 instructed L5 medical providers and staff to "call in" prescriptions to local pharmacies using the X-Numbers of Physicians 1 and 2 for patients for whom Physicians 1 and 2 had not provided medical care.

### Overt Acts of the Conspiracy

30.     On or about June 18, 2015, Physician 1 notified BARNES and L5's COO that he would leave behind signed prescriptions while he was not in the Blacksburg office to allow prescriptions to be written using his X-Number for patients for whom he did not provide medical care.

31.     On or about January 22, 2018, BARNES instructed L5 employees not to implement a random urine drug screening policy.

32.     On or about March 6, 2018, L5's COO instructed L5's medical providers to classify all pain patients as "high risk."

33.     On or about March 12, 2018, BARNES asked Physician 2 to continue his employment relationship with L5.

34.     On or about July 5, 2018, L5's COO instructed L5 staff that L5 was implementing a urine drug screening policy.

35.     On or about September 19, 2018, L5's COO suggested to BARNES that Suboxone prescriptions be "called in" using Physician 2's X-Number at L5's Woodlawn clinic.

36.     On or about November 3, 2018, BARNES initiated a wire payment to Physician 1 to pay Physician 1 for use of his X-Number.

37.     On or about November 20, 2018, L5's COO instructed L5 employees to bill all care provided by any L5 provider or employee under an in-network L5 physician.

38.     On or about April 15, 2019, L5's COO and another L5 employee instructed a medical provider without an X-Number to write Suboxone prescriptions purportedly "for pain" because she was not legally permitted to write a Suboxone prescription for opioid addiction treatment.

39.     On or about April 19, 2019, L5's COO paid Physician 2 for use of his X-Number.

40.     On or about April 22, 2019, BARNES fired an L5 medical assistant after she expressed concerns to BARNES and L5's COO about using Physician 2's X-Number and after she had relayed that a pharmacist had questioned prescriptions for patients under Physician 2's credentials that Physician 2 had not seen.

41.     On or about May 6, 2019, an L5 employee texted Physician 2 in an effort to persuade him to continue allowing L5 to use his X-Number to write prescriptions for patients for whom Physician 2 had not provided medical care.

42.     On or about June 18, 2019, L5's billing coordinator emailed L5 staff to remind them of L5's urine drug screening policy.

43.     On or about July 23, 2019, L5's COO caused a staff member to ask Physician 2 whether two Suboxone prescriptions could be written under his name for a patient seen by another medical provider.

44.     On or about August 16, 2021, L5 billed Virginia Medicaid using Physician 2's DEA number for a patient for whom Physician 2 did not provide medical care.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

1.     Upon conviction of the felony offense alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses, pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

2.     The property to be forfeited to the United States includes but is not limited to the following property:

> A forfeiture money judgment not less than $250,000 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate was obtained directly or indirectly as a result of said offense or is traceable to such property.

3.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

Date: 7/26/23

Christopher R. Kavanaugh /scj

**CHRISTOPHER R. KAVANAUGH**
**UNITED STATES ATTORNEY**